The Judges
delivered their opinions.*
Judge Carr.
The bill states, that John Switzer died intestate, seised and possessed of a tract of land within the Beverley manor, in the county of Augusta: that the heirs of said Switzer entered upon the said land, and remained in possession thereof, until a few years since, when they sold it to a certain John Coalter, a brother of the plaintiff’s: that some of the heirs made a deed to the said John, (which is exhibited,) and the others have either executed deeds, orare ready to do so at any time: that although the contract was made with the heirs by the said John, and the conveyances taken to him, the purchase was for the benefit of the plaintiff, as well as the said John: that accordingly, the plaintiff has been put into possession of his undivided part of the said land, his right to which is not disputed by his brother: that since the purchase, the plaintiff has had the land surveyed, a plat of which is exhibited: that this plat, as he believes, correctly describes the boundaries of t.he land; but he discovers, that a part of the boundary is controverted by some of the coterminous tenants, to wit: Robert Stuart, Reuben Withers, and the heirs and devisees of Neil Adair: that the plaintiff is desirous of making partition with his brother, but cannot, because of the uncertainty caused by this dispute about the boundary: that he is anxious also, to have the question of boundary settled, but not having the legal title, cannot go into a Court of Law; and if he could, it would require a multiplicity of actions. He therefore prays, that his brother John, and the coterminous *78 tenants, may be made defendants: that the true boundary of the land may be settled: that the defendants be compelled to deliver to him any land within the boundary, of which they may be found in possession; and that partition f,e decreed between himself and his brother.
The defendant John Coalter answers, stating that his interest in the land is one seventh part: that he wishes a partition: is ready to convey, &c.
The coterminous tenants answer, shewing various objections to the plat, and pretensions of the plaintiff; deducing their titles, which seem entirely distinct, and unconnected with each other; and each one contending for his lines, as heretofore established and understood.
Evidence was taken, surveys had; and the Chancellor, on hearing, established certain lines; from which decree, the appeal is taken.
It was contended in the argument, that this was a case, of which equity had no jurisdiction. This question will of course be considered first, as jurisdiction precedes discretion; and before we undertake to decide what ought to be done in a cause, we should always ascertain whether we can rightfully do any thing. I will not quote authorities to shew, that where a general demurrer would hold to a bill, the Court, though the defendant answers, will not grant relief upon the hearing of the cause. The doctrine is too well settled. To deny it, would be to say, that however unfit the cause for equity, the defendant, by failing to demur, could oblige the Court to entertain jurisdiction. Nor can I conceive, that in deciding the question of jurisdiction, we should be influenced at all by the case made by the evidence. It is the province of the bill to state the case. It is from this we must judge. If the evidence fit the case stated in the bill, it could of course have no influence. If it made a different case, so far from giving jurisdiction where the bill did not, it would prevent a decree, where the bill was perfect; for the allegation and the proof must “jump together.”
*79 The bill places the jurisdiction on three grounds: 1. That the plaintiff wants partition, and cannot have it without the aid of equity. 2. That there is a trust between the plaintiff and his brother, who has the legal estate; which the plaintiff not having, cannot try the question of boundary, at law. 3. That if he could, there must be a multiplicity of suits, to avoid which, equity takes jurisdiction.
I will first shew, from authority, the general rule, that equity cannot hold plea of land titles; and then enquire, whether the plaintiff’s case falls within, or is taken out of, that rule.
In Welby, appellant, v. The Duke of Rutland, respondent, 6 Bro. Parl. Cas. 575, the bill charged, that the plaintiff, and those under whom he claimed, had been in possession of the manor of Denton, for more than one hundred years: that the defendant had set up a claim to it, and exercised several acts of ownership, which might hereafter bring a cloud upon the plaintiff’s estate, and prevent his selling it. The bill therefore prayed, that the defendant might set forth his claim, and produce his title papers: that the testimony of the plaintiff’s witnesses might be perpetuated, and proper issues directed to try the defendant’s claim.to the manor, &e. The defendant pleaded and answered. The case was heard and dismissed by Lord Chancellor Apsley; and on appeal to Parliament, the appeal was dismissed, and the decree affirmed. In the discussion of the case, the law on the subject was laid down in the clearest and strongest manner. It was said, “ the general practice of Courts of Equity, in not entertaining suits for establishing legal titles, before they have been tried at law, is founded upon clear reasons; and the departing from that practice, when there is no reason for so doing, would be subversive of the legal and constitutional distinctions, between the different jurisdictions of Courts of Law and Equity; and though the admission of a party in a suit, is conclusive as to matters of fact, or may deprive-him of the benefit of a privilege, which, if insisted on, would exempt him from *80 the jurisdiction of the Court; yet, no admission of parties can change the law, or give jurisdiction to a Court, of a cause, of which it hath no jurisdiction. Agreeably hereto, the established and universal practice of Courts of Equity ¡s t0 dismjss the plaintiff’s bill, if it appears to be grounded on a title merely legal, and not cognizable by them; notwithstanding the defendant hath answered the bill, and insisted on matter of title; and it can make no difference, whether the legal title be insisted on by the answer, or by the plea: that nothing hath a greater tendency to introduce uncertainty in the law, than the giving way to new exceptions to general, settled and known rules of practice in Courts of Justice; and therefore, no such exceptions ought to be allowed, but upon the clearest grounds. The general known practice of Courts of Equity has been to dismiss bills brought like the present, for establishing a legal title, and for a perpetual injunction, before such title has been tried and determined at law. The exceptions to this general rule of practice are but very few, well known, and founded on strong and clear reasons; but the appellant’s case fell not within any of these exceptions, and consequently ought to be governed by the general rule. The bill was entirely new, and without a precedent.” To shew that this, though the argument of counsel, is considered as the true doctrine on this subject, Maddock, vol. X, p. X35, lays down the rule precisely as it is here, and refers to this case alone, in support of his position.
Chancellor Kent, also, in Abbott v. Allen, 2 Johns. Ch. Rep. 519, says: “This Court may, perhaps, try title to land, when it arises incidentally; but it is understood not to be within its province, when the case depends on a simple legal title, and is brought up directly by the bill. The power is ody to be exercised in difficult and complicated cases, affording peculiar grounds for equitable interference. This was the doctrine laid down by the respondent’s counsel, in the case of Welby v. Rutland, 6 Bro. Parl. Cas. 575; and it appears to have been sanctioned by the *81 Court.” The case here referred to, is the one from which I have extracted the above remarks. The Chancellor also refers to Wightwick’s Reports, 184, where the same doctrine (he says) is discussed at large, and emphatically laid down by Baron Wood, and not denied by the other Barons. The cases above cited acknowledge that there are a few exceptions to the general rule. They will be found of the class described by Mitford, 137. He says: “ Where one general legal right is claimed, against several distinct persons, a bill may be brought to establish the right. 3 Atk. 484. Thus, where a right of fishery was claimed by a corporation, throughout the course of a considerable river, and was opposed by the Lords of Manors, and owners of land adjoining, a bill was entertained to establish the right, against the several opponents, and a demurrer was overruled.55 1 Atk. 383. But, even where the bill is to try one general right against many claimants, and so to save a multiplicity of actions, it is generally required, that the plaintiff shall have established his title at law, before he comes into equity; and Mitford adds, if he has not done so, and the right he claims has not the sanction of long possession, and he has any means of trying the matter at law, a demurrer will hold. 3 Atk. 391. In 1 Atk. 284, Mayor of York v. Pilkington, &c. Lord Hardwicke says: iC It is a general rule that a man shall not come into a Court of Equity, to establish a legal right, unless he has tried his title at law, if he can; but this is not so general an objection as always to prevail;55 and he refers to two cases in Precedents in Chancery. I find them to be thus: Bush v. Western, Free, in Chan. 530. The plaintiff had been in possession of a water course, upwards of 60 years. Defendant disturbed him in the use of the water. He brought his bill to be quieted in his possession. Objected, that his remedy was purely legal; but the Court over-ruled the objection, considering, I presume, that a possession of upwards of 60 years was equal to a decision of law in his favour; and therefore, the bill to quiet his possession was proper, as other *82 wise the plaintiff would have had to bring continual actions 0p treSpaSs for every disturbance. The other case is Dorset v. Girdler, Pre. in Chan. 531. Bill to examine witnesses in perpetua,m rei memoriam, to establish his sole rjght of fishery. Demurrer, for that plaintiff had not verified his title at law. But the demurrer was over-ruled, and this difference taken by the Court, that “if one is out of possession, having only a right to fishery, Sic. he who brings such bill ought never to be allowed to do so, but a demurrer to it will be good, because he may and ought, first to enter his action and establish his title at law, &c. for the party having a remedy at law, the other side ought not to be deprived of the opportunity of confrontingthe witnesses, and examining them publicly, which has always been found the most effectual method of discovering the truth. But, if a man is in actual possession, and is only threatened with disturbance by another who pretends a right, he has no other way in the world to perpetuate the testimony of his witnesses, but by such a bill as this. 2 Atk. 483, Lord Tenham v. Herbert. Bill to establish a right to an oyster fishery, and to be quieted in the possession of it, against defendant, who claims the piece of ground where the fishery is. Demurrer, as it is a matter properly triable at law. Lord Chancellor: “ Undoubtedly there are some cases, where a man may come, by a bill of this kind, into this Court first; and there are others, where he ought first to establish his right at law. Where a man sets up a general exclusive right, and the persons who controvert it with him, are very numerous, and he cannot, by one or two actions at law, quiet that right, he may come into this Court first; which is called a bill of peace, and this Court will direct an issue to try the right. But, where the question about a right of fishery is only between two Lords of Manors, neither can come into this Court, till the right is first tried at law. This is in the nature of an ejectment bill,” &c. Renison v. Ashley, 2 Ves. jun. 459. Bill for discovery and delivery of a settlement, under which plaintiff claimed, and other title deeds *83 and possession of the estate. Demurrer to all the relief, and all the discovery,, except of the settlement, for want of equity, and answer admitting the settlement, and offering to produce it. Lord Chancellor: “ This is a pure ejectment bill, as to the title to the land. The only allegation calling for an answer, is as to this deed- The Court will direct it to be produced at the trial, but no more. The plaintiffs have no right to a discovery of the pedigree, unless they lay a foundation for it; otherwise, no man would bring an ejectment, which had any complication in it. The cases cited for the bill go no further than this; that the loss of the instrument with the affidavit, entitles the plaintiff to a decree quoad the matter; the loss of a bond gives a right to a decree for the money, and so of a deed. I agree, no general demurrer could be put in to such a bill. The jurisdiction is transferred to a certain extent. But what is the equity here? Is it possible for me to decree, that the deed shall be delivered up? There is no allegation of infancy, a term outstanding, or that possession was gained by undue means.. The plaintiffs state, that under colour of a legal title, the defendant entered as heir, which title they deny. The only relief I can give, is to enable them to make out their title at law.” He adds: 11 This is another of the fishing bills, which I do not like to see in this Court.” 1 Bro. Ch. Cas. 572, Weller v. Smeaton. Bill to be quieted in the possession of a mill, and that defendants may pull down works above it, and be restrained from erecting others. Demurrer, because plaintiff had not established his right at law. Allowed.
I will refer to but one case more, Speer v. Crawter, 2 Meriv. 210. It is important in its bearing on this subject, both as containing the strong opinion of that able and learn* ed Judge, Sir W. Grant, and as g'iving the best account of a sort of jurisdiction, exercised by equity for a while, respecting the boundaries of land; which he considers as originating in consent, which was disapproved of by their greatest Chancellors, and soon abandoned. He cites the *84 case of Wake v. Conyers, 2 Cox. 36, where Lord Northingtoñ refused this jurisdiction, which he said had been “ assumed of late;” and two cases, in which Lord Thurloio had done the same. He then adds: “In the same case of Wake v. Conyers, Lord Northington says, that in his apprehension, this Court has simply no jurisdiction to settle the boundaries even of land, unless some equity is super-induced by act of the parties. I concur (he says) in that opinion, and think that the circumstance of a confusion of boundaries furnishes, per se, no ground for the interposition of the Court.”
Having shewn that this Court has no jurisdiction to interpose in questions of real property, unless some equity be superinduced by act of the parties, let us see whether any such foundation is furnished by this case.
The plaintiff wants a partition; but, in a suit in equity for partition, the legal title of the parties is never meddled with by the Court. The jurisdiction is not given by Statute, but assumed from the extreme difficulty, and inconvenience of proceeding at law. In exercising this jurisdiction, equity has considered itself bound by the principles, which govern cases of partition at law; and these being only between joint-tenants and tenants in common, the question of title cannot well arise. The individual rights of the parties to participate in the division, or to call for it, may come up; but not the simple question of conflicting title to the tract of land. Accordingly, it is established by the cases, that a plaintiff who comes into equity for partition, must shew a clear legal title. If there be doubt about that, he will not be aided. See Wiseley v. Findlay, 3 Rand. 361, where this subject was examined. This case, then, where the bill prays a settlement of boundary, and that the defendants be decreed to deliver to the plaintiff any land of his they may be in possession of, cannot be a proper case for partition in equity.
But there is another objection. The equity, as to partition, does not reach, or affect in the slightest degree, the *85 coterminous tenants. They are wholly unconnected with it. They have done no act superinducing equity, and cannot, by the acts of others, be drawn away from the proper tribunal for deciding legal titles. This applies also to the ground relied on, that as between the plaintiff and his brother, or the heirs of Switzer, there is a trust which gives equity jurisdiction. The coterminous tenants, holding distinct tracts of land, by distinct and unconnected titles, have nothing to do with this trust or equity. If the brother refuses to permit the plaintiff to use the legal title, for settling the boundaries at law; or the Switzers refuse to convey; a bill against them for these purposes, would receive proper aid. But, it is no where suggested that John Coalter had refused to proceed at law, or to suffer the plaintiff to use his name; and as to the Switzers, they are no parties, and it is expressly stated, that they have either all conveyed, or are ready, at any time, to convey.
It is said, that this proceeding will save multiplicity of suits at law, and therefore equity should interfere. The first answer to this is, that it would not save multiplicity of suits; for, John Coalter might have sued, in one ejectment, all persons in possession of any part of the tract he claimed; Coleman v. Dick & al. 1 Wash. 239; but secondly, this is not one of those cases, where equity does interfere to prevent multiplicity of actions. That interference is given only in cases, where one general right is invaded, as a right to a sole fishery of a river, &c. Mitf. 147. But here the rights of the parties were separate, distinct and unconnected; and the bill was for that reason also demurrable. In Mitf. 146, it is said, “ The Court will not permit a plaintiff to demand by one bill, several matters of different natures, against several defendants; for, this would tend to load each defendant with an unnecessary burthen of costs, by swelling the pleadings with the state of the several claims of the other defendants, with which he had no connexion. A defendant may, therefore, in such case, demur.” See also, 2 Mod. 234. Harrison & Clure v. Hogg, 2 Ves. jun. 323.
*86 I think the decree should be reversed, and the bill dismissed; perhaps without prejudice to the legal rights of the plaintiff, or rather of his trustee,
Judge Green.
John Coalter having purchased a tract of land from the heirs of Switzer, two of whom had conveyed to him, and the other five of whom had not conveyed, Thomas S. Coalter filed his bill against John Coalter, Robert Stuart, Reuben Withers, and the heirs of Adair, alleging, that although the purchase was made by John Coalter, it was made for his benefit as well as for John’s. He does not state what proportion belonged to each; but states, that he has been put into the peaceable possession of his undivided part, John not contesting his right: that he is desirous of having a partition with his brother; but that having no legal title, he cannot proceed at law, for that purpose; and that the other defendants being coterminous tenants of other lands, dispute the boundaries, which prevents a partition; and that these boundaries cannot be settled at law, without a multiplicity of suits. He therefore prays, that the defendants, the coterminous tenants, may state in what points they dispute the boundaries: that the Court may settle and adjust the true boundary; and that he may be quieted in possession accordingly, and the defendants decreed to deliver to him possession of any land within the true boundary, which they may have taken possession of; and that partition between him and his brother may be decreed. It is not alleged, that John refuses to make partition; and the heirs of Switzer, who have not conveyed, are not made parties. It appears also, that the coterminous tenants held severally, and do not claim under the same title.
The question is, whether a Court of Equity has jurisdiction to give the relief prayed for. I think not. It has always been held as a general rule, that equity cannot hold pleas of land; 20 H. 6, 32, b; and in the case of the Earl *87 of Worcester v. Sir Moyle Fynch, 2 And. 163, pl. 89, and 4 Inst. 85, it was held by all the Judges of England, that if the question whether there was such a Manor as oí. in deed or reputation, at such a time; or whether lands in B. were at that time parcel of the Manor or not; or if a disseisin be alleged to be committed of Blackacre, at the time of a bargain and sale made to the complainant thereof; or if ol. conveys land to B. and A. has only a matter of equity to be relieved by, or only a right at the time; or when any title of freehold, or other matter determinable by the common law, comes incidentally in question in Chancery; that in all these cases, the Court of Equity has no jurisdiction; and such matters should be tried at common law, and not in Chancery; that the party may be relieved by writ of error, attaint, or action of a higher nature; and, that if the plaintiff prays discovery from the defendant, without which he cannot sue at common law, and the defendant makes title to the land, the plaintiff cannot proceed for the land in Chaneery; for otherwise, by such a surmise, inheritances, freeholds, and matters determinable at common law, should be determined in Chancery. To this general rule, there is an exception, where the plaintiff has an equity against the defendant himself; as, if a tenant holds adjoining lands of his own, and fraudulently or carelessly, contrary to his duty to preserve the rights of his landlord, confounds or destroys the evidence of the boundaries. There the landlord, who cannot sue at law, during the Term, or who could not, after the Tern;, establish his boundary at law, may sue the tenant in equity; not for the purpose of establishing his boundary, but for having a decree that the tenant shall transfer to him so much of his land as will make up the original quantity, belonging to the laudlord. In such ease, if the actual boundary was proved by the tenant, the suit would fail; and in this way the question of boundary may properly be discussed, and virtually settled in Chancery.
*88 It appears that for a short time, some sort of jurisdiction wag assutned by the Court of Chancery, in respect to boundaries. The cases are collected in 4 Vin. Abr. 422, 423. But, the jurisdiction which originally arose from consent by analogy to common law writs, was soon repudiated. This subject was examined by the Master of the Rolls in Speer v. Crawter, 2 Meriv. 410, in which all the former cases were cited. In .this case, the Master of the Rolls Concurring with the opinions of Lord Northington and Lord Thurlow, affirms that there is no jurisdiction, unless some equity be raised by the acts of the parties; and observes,- that to the exercise of the jurisdiction upon such equitable grounds, no objection has ever been made. “But, on what principle can a Court of Equity interfere between two independent proprietors, and force one of them to have his rights tried and determined in any other than the legal mode, in which questions of property are to be decided?”
There is in this case no shadow of equity between the plaintiff and the defendants, who claim title to the adjoining lands; and any equity between him and the holders of the legal title, the Switzers, who have not conveyed, and John Coalter, cannot affect them, unless there was a fraudulent combination between them and the holders of the adjoining land, to injure the plaintiff, which is not suggested; and even in that case, they could not be called upon in equity to ascertain the boundaries. The only relief the plaintiff could have, would be, to aid the plaintiff so far as to compel the owners of the legal title, to permit him to sue at law in their names. John Coalter, in whom is the legal title to an undivided two-sevenths of the land, might sue at law, and establish the boundary of the entire tract of land, and he is not stated to be unwilling to sue. Indeed, he might have sued all who claimed any part of the land, in one ejectment, if they were in possession of the controverted land; so that a resort to equity does not prevent multiplicity of suits.
*89 The observation that the plaintiff has no equity against the adversary claimants of the land, is an answer to all the cases cited by the appellee’s counsel, in which the jurisdiclion is founded on the equitable nature of the plaintiff’s title. In the case of an assignee of a bond, there is, in equity, a privity of contract between bim-rnd the debtor. In the case of property seized under execution, which is conveyed in trust for another, the relief given to the cestui que trust, is upon the equify of preserving the specific property to the true owner, when it is of such a nature as not to be compensated in damages; an equity, which exists in favor of the legal, as well as equitable owner. The property might be eloigned, and an action of detinue might not restore the specific property; but land cannot be eloigned. In the case of a tract of land conveyed to be sold for payment of debts, and the property claimed in whole or in part, by another, the Court may, in proper cases, interfere, at the instance of the debtor, to prevent a sale, until the question of title is determined; because a sale might do him irreparable injury. ■ But, in that case, the title of the adverse cláimant could not be settled in equity, or in that suit.
Nor can the equitable jurisdiction, to decree partition, justify an investigation of the legal title of one, who claims adversely against all who claim partition. Where several claim to be entitled to partition, the Court may enquire, as between them, which of them are entitled to come into the partition; and thus incidentally determine the legal title as between them. But, even in that case, if the legal title of one party is disputed by the others, as if they allege the deed, under which he claims, to be forged, the bill for partition will not be entertained, and the parties will be left to litigate the title at law. This subject was examined in the late case of Wiseley v. Findlay, 3 Rand. 361. In this ease, there does not appear to have been an adversary possession; and the partition might have been made without involving the coterminous tenants in the suit.
*90 This seems to be a bill quia timet, not justified by the principles, upon which such bills are allowed. If this jurisdiction of the Court of Chancery could be sustained, all cases of title and boundary of lands, might be transferred contrary to the Bill of Rights, which declares, that “ In controversies in respect to property, the ancient trial by jury is preferable to any other, and ought be held sacred.”
There is another objection to this bill. It is multifarious. It calls upon Stuart, Jldair and Reuben Withers, claiming severally different parts of the land claimed by the plaintiff, to defend one suit. They claim nothing in common; neither is at all interested in the defence to be made by the other; and yet, if the plaintiff succeeded against one only, he would be liable to pay the costs of the plaintiff, expended in the prosecution of his claims against the others. It is not alleged, that the whole controversy between all the parties, depends upon the establishment of one line. That is not the fact; and if it were, the possession of one of the defendants might give him a right, which the other had not.
I think the decree should be reversed, and the bill dismissed.
Judge Coalter.
• As to the question of jurisdiction, I understand it to be admitted, that as no demurrer was filed to the bill on that ground, we are not confined to the statements in the bill alone, in considering that question; but if the proofs or-documents in the cause, (all pertinent to the issue, as in this case,) shew a ground of jurisdiction, which, had it been relied on in the bill, would have supported that jurisdiction on demurrer, it must be looked to and considered, in the same manner as if stated in the bill. If this be correct, it will be found, that the following circumstances, having, as it seems to me, a strong bearing on this point. *91 are to be found in the cause, in addition to the grounds alleged in the bill.
It appears from the survey returned by order of Court, in the cause, that almost the whole controversy, as it respects boundary, which exists between the appellee and the Adairs, and also between him and Stuart, depends on the establishment of the Beverley Manor lines; as both parties claim to hold by those lines.
The Beverley Manor, is a large tract, comprehending a considerable portion of Augusta county. It was sold off in parcels to settlers. Amongst others, one Patton obtained a deed for a considerable tract, binding on some of the southern limits of the Manor, and part of which is now claimed by the appellee. Stuart, an ancestor of the appellants of that name, obtained another tract adjoining Patton, and binding also on the southern boundary of the Manor. After this, Stuart obtained a grant from the Crown for lands on the south of the Manor, and calling to be bounded by the Manor line, and joining, not only his own lands within the Manor, but those also of Patton. So too, some one else, under whom the Adairs claim, obtained, in like manner, a grant from the Crown adjoining Stuart’s grant aforesaid, and calling for the Manor lines, to w.it: a portion of that line called for by Stuart’s grant, and two other of the Manor lines lying east of it. One of the Manor lines, then, is common to both of these grants, and as it cannot exist in two places, if it is rightly determined to exist in one place in regard to Stuart, it must exist in the same place, as to the Adairs. The establishment of this line, too, must fix one of the corners of the next line eastward, where the Adairs alone are interested; and so, vice versa, the establishment of that line must fix one of the corners of that which bounds Stuart’s land. Thus, if E. F. is established as the true Manor line as to the Adairs, this fixes F. as the corner of the line, by which Stuart is to be bounded, and.of course, his pretensions must be negatived; but in establishing this line, all *92 the evidence and circumstances in relation to the lines A. B., B. C., C. D. and D. F. are to be weighed,-and are equally important to the Adairs and Sttiart. So if G-. F. is established as the true Manor line in regard to Stuart, anq jn a contest with him, it fixes F. as a corner of the line of the Adairs, and of course, disaffirming their pretensions. But, whether this is the true line or not, depends not only on the evidence as it regards the lines A. B. &e. as aforesaid, but on the evidence concerning the lines G. H., I.K.,.J. L., L. M. arid indeed all the other-lines laid down in the plat, in relation to this part -of the boundary. It is an unquestioned fact, then, as to this matter, that although Stuart and the Adairs claim distinct tracts by distinct titles, the question of boundary, so far as the Manor lines are concerned, depends precisely on the same evidence in relation to every portion of the plat and controversy as to each. The case cannot be correctly decided differently as to-these parties; for, if decided differently, one or the other of those decisions must as surely be wrong, as that the same thing can exist in two places at the same time.
It seems, then, that if each controversy is to be correctly decided; in other words, if there ought not to be opposing decisions, the matter ought to be settled in one suit, if that be practicable. Suppose two suits are brought for the purpose, and in that against Stuart, F. G. is decided to be the Manor line; such decision might have, and probably would have, considerable influence in the controversy with the Adairs. They ought to guard against this, by giving Stuart all their aid-; for in deciding the matter as to Stuart, the whole survey and evidence, as well as it regards the Adairs as Stuart, are important in that controversy, ánd must be considered. But the Adairs, not being parties, are not hound by that decision, and they have the question tried over again on the same surveys and evide'nee; and Z. Y. are fixed as the boundaries or Manor lines. Which verdict is to prevail? And if both are to *93 stand, the boundaries of the appellee are entirely; destroyed; for no one can say, which is the Manor line. Thus two suits, depending on precisely the same surveys and facts, and in which there may be different decisions, are to go on at precisely double costs and trouble to all parties.
Had this ground of jurisdiction been stated in the bill, would it have been proper to have sustained a demurrer, and to have turned the parties round to several suits at law? It may be said that one ejectment could have been brought against, all the defendants, so as to have tried the matter in one suit. If this could be, had not that action been barred by length of time, yet from the evidence, it seems probable this would have been the result; at least as to some of the lands, and some, of the parties; and if the party had been driven to his writs of right, it might have been very unsafe to have counted for his whole tract of land against all the defendants. His safest course, in either action, most probably would have been by separate suits.
Although consent of parties will not give jurisdiction, yet, if to a bill framed on the real facts as they now appear, the defendants had admitted those facts, and submitted their case to the jurisdiction of the Court, as the safest and best course for all the parties, would it have been expedient, after the whole matter was thus fully and fairly before the Court, to have dismissed the bill for want of jurisdiction ? I am not prepared to say that it would. I have not had access to many of the authorities cited on this point; but I think the principles laid down in the case of the Mayor of York v. Pilkington & al. 1 Atk. 282, go to support the jurisdiction in this case.
There was another difficulty in this case. Thomas Coalter has only the legal title to a small undivided portion of this land; the title to the residue still remaining in the other heirs of Switzer; so that he might have found some difficulty in suing at law. This title, it is true, they may be willing to make, as the bill states; but when it will be in the power of the party to get it in, does not appear. *94 They are numerous, and may be dispersed; and in the mean t¡me> jf the boundary can be settled, there will be no ac~ tual controversy remaining, and partition may be made.
On the whole, and believing that few cases can occur, so peculiarly situated as this, I incline to support the jurisdiction of the Court, instead of turning the parties round to the variety and number of suits at law, which their case may require; in which there may be contradictory decisions on the very same evidence, both of which cannot be right.
This inclination, however, is not without many doubts, which are greatly increased by the opposing opinions of my brethren.
Judge Cabell was of opinion that the decree should be reversed; which was entered as the decree of the Court.

 The President absent.